# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

United States Courts
Southern District of Texas
ENTERED

JUN 2 4 2002

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| AMERICAN IMAGING SERVICES, INC., | § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. H-97-1394 |
| INTERGRAPH CORP., | § § | |
| Defendant. | § § | |

## MEMORANDUM AND ORDER

American Imaging Services, Inc. ("American Imaging") sued Intergraph

Corp. ("Intergraph"), alleging that Intergraph's products infringed U.S. Patent No.

5,353,393 to Bennett *et al.* (the "'393 patent"). This court granted Intergraph's

motion for summary judgment, on the basis that the claims in the '393 patent were

anticipated and obvious, and thus invalid, under 35 U.S.C. §§ 102, 103. American

Imaging appealed this court's decision to the Federal Circuit, which affirmed in part,

reversed in part, vacated in part, and remanded to this court. Intergraph has now

moved for summary judgment as to the four remaining patent claims, asserting that

they were obvious and therefore invalid under section 103. (Docket Entry No. 69).

American Imaging has responded. (Docket Entry No. 77).

2622  1447P \CASES\97\97-1394\97-1394 n03 wpd

Based on a careful review of the motion and response, the parties' submissions, the Federal Circuit's decision, and the applicable law, this court DENIES Intergraph's motion for summary judgment, for the reasons set out below. This court also ORDERS counsel to appear in Courtroom 11-B on **August 30, 2002 at 2:00 p.m.**, for a status conference to set a scheduling and docket control order for the issues remaining in this case.

## I.  Background

The '393 patent relates to an apparatus and method for manipulating scanned documents using computer-aided design ("CAD") commands.  The technology described in the '393 patent allows conversion of a paper document, such as a hand drawn engineering design, into computer-readable electronic form; permits changes to the document using computer tools; and makes the edited version available in both hard copy and electronic forms.  American Imaging, the holder of the '393 patent, sued Intergraph for infringement.

This court granted Intergraph's motion for summary judgment on the grounds that the '393 patent claims were anticipated and obvious in light of the "SuperPaint" software, a general graphics paint program that had entered the market two years before the applicants filed for the '393 patent.  American Imaging appealed that decision to the Federal Circuit, which affirmed in part, reversed in part, and

remanded for further proceedings.  The Federal Circuit affirmed this court's finding of anticipation as to claims 1 through 7 and claims 14 through 29.  The Federal Circuit disagreed with this court's findings of anticipation as to claims 8 through 11, 30 through 34, and 37 through 41, because they limited the electronic display means to a CAD system, which was not present in the SuperPaint software.[1]  However, the Federal Circuit found that those claims were obvious in light of SuperPaint and affirmed this court's finding of invalidity on that basis.  The Federal Circuit explained:

> The '393 patent sought to solve the problem of manipulating scanned documents using CAD commands and facilitating the editing of a document and its reproduction in hard copy form. *See* '393 Patent, Col. 2, ll. 1-17.  Although SuperPaint does not operate to produce engineering drawings, it teaches the art of scanning an image to create a raster file, modifying the raster image using vector commands and merging and editing the raster image and the vector changes in a paint program that can be reproduced in hard copy form.  More pointedly, SuperPaint teaches, in a general graphics program, to one of ordinary skill in the art of computer programming, the solution sought by the '393 patent.  It would have been well within the knowledge of one of ordinary skill in the art to apply these teachings within a CAD system, which itself is a species of graphics programs.  Therefore, we conclude that claims 8 through 11, 13, 30 through 34, and

---

[1]      The Federal Circuit defined a "CAD system" as "a species of graphics programs particularly well-suited for producing engineering drawings." (Docket Entry No. 58, p. 7).  The court found that SuperPaint did not contain this limitation. (*Id.*).

37 through 41 would have been obvious as a matter of law in light of SuperPaint and the knowledge generally available to one of ordinary skill in the art attempting to solve the problem these claims sought to address.

(Docket Entry No. 58, pp. 12-13).

The Federal Circuit reversed this court's finding of obviousness as to claims 12, 35, 36, and 42, stating as follows:

[A]bsent a teaching, suggestion or motivation that one of ordinary skill in the art would reconfigure SuperPaint for use in an operating system having an interrupt vector table, [the] conclusion of obviousness is erroneous.

Furthermore, the record lacks any evidence regarding whether SuperPaint, which admittedly does not include the ability to operate with an interrupt vector table, suggests to one of ordinary skill in the art to reconfigure SuperPaint to enable it to work with an operating system having an interrupt vector table. Although an expressed suggestion to configure SuperPaint to work with such an operating system is not required, there must be some suggestion found in the field of knowledge generally available to one of ordinary skill in the art or motivation to combine from the problem itself. [citations omitted].   Mr. Snider's declaration, quoted by the district court in support of its obviousness determination is merely a conclusory statement that one <u>could</u> write a program to address these matters.  His declaration, especially because he was not versed in DOS operating systems, is insufficient to support a conclusion of obviousness.

Moreover, SuperPaint only teaches the art of converting a document into computer-readable form wherein the user can modify the document and reproduce it in hard-copy

form.  SuperPaint does not teach one of ordinary skill in the art the ability to reconfigure the SuperPaint program to operate within a conventional DOS operating system and the problem these claims sought to resolve would not motivate an ordinarily skilled artisan to reconfigure a Macintosh-compatible paint program to manipulate an interrupt vector table.  Because there are genuine issues of material fact that must be resolved in order to determine whether claims 12, 35, 36 and 42 would have been obvious, summary judgment on these claims was incorrect.

(Docket Entry No. 58, pp. 13-14).

On remand, Intergraph has again moved for summary judgment as to claims 12, 35, 36, and 42.  Intergraph now asserts that these claims were obvious because they describe "standard features" of many operating systems, in which the use of an interrupt vector table was "a well-known fact and would have been obvious to any competent computer programmer . . . ." (Docket Entry No. 69, p. 2).  Intergraph has provided additional evidence, including the declarations of Dennis Sanders, a senior software engineer at Intergraph, and Dr. Walter Rudd, a professor of computer science at Oregon State University; excerpts of text books describing interrupt vector tables as early as 1976; and excerpts from the deposition of Paul Bennett, a co-inventor of the '393 patent.  American Imaging has responded and submitted additional evidence of its own, including the declaration of Gordon Peterson, a computer software expert retained by American Imaging; excerpts of the

deposition testimony of Paul Bennett and Wylie McDonald, co-inventors of the 393 patent; and excerpts of the deposition testimony of William Snider, a SuperPaint programmer.

The remaining four claims at issue describe a system that allows a CAD system, which typically displays only vector images, to interact with an auxiliary program that permits the user to view the CAD system's vector image while simultaneously viewing and editing a raster image. The claimed system achieves this interaction by redirecting program flow through use of an "interrupt vector table." An "interruption" means that "one program is stopped, another executed, and the former resumed, without any effect except for a time delay, upon the executing program." (Docket Entry No. 72, Ex. B, Walter Rudd, ASSEMBLY LANGUAGE PROGRAMMING AND THE IBM 360 AND 370 COMPUTERS 234 (Prentice Hall 1976)). The parties agree that this feature – the ability to execute multiple programs using interrupts – has been an essential component of many computer operating systems for nearly twenty years.  A number of operating systems manage interrupts by using an "interrupt vector table," a register that records the address of the interrupt service routine so that the interrupted program may be resumed. (*Id.*, Ex. F, George Gorsline, MODERN MICROCOMPUTERS: THE INTEL I8086 FAMILY 159-60 (Prentice Hall 1985)).

Claims 12, 35, and 36 describe the redirection or "remapping" of the CAD system's display driver interrupt to a "link" program, which displays a raster image and allows the user to overlay the CAD system's vector image on the raster image. Claim 42 describes the remapping of the CAD display driver interrupt to an "edit" program, which allows the user to modify the raster image. Together, the "link" and "edit" programs permit the user simultaneously to view a vector image and to view and edit a raster image. The "link" and "edit" programs are accessory programs that can operate with an unmodified version of the CAD system to achieve the added benefit of simultaneously viewing and editing raster images. The "link" and "edit" software allows the user to merge the vector created modifications into the raster image.

The operating systems for Apple Macintosh computers do not use interrupt vector tables. Other operating systems, such as DOS and UNIX, have used interrupt vector tables for nearly twenty years. SuperPaint was compatible only with Macintosh computers, not computers using DOS or UNIX systems. However, Intergraph asserts that the undisputed facts show that a person of ordinary skill in the art could have adapted SuperPaint to a system with an interrupt vector table. Intergraph argues that the motivation to do so was strong, making the remaining claims obvious and thus invalid under 35 U.S.C. § 103. American Imaging disputes

that the facts permit this court to conclude that the claims were obvious as a matter of law.

## II.     The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56. Under FED. R. CIV. P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). The party moving for summary judgment, whether a plaintiff or defendant, must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *See id.*

When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. *See McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995). The nonmovant must go beyond the pleadings and

designate specific facts showing that there is a genuine issue for trial. *See Little*, 37 F.3d at 1075 (citing *Celotex*, 477 U.S. at 325). The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Webb v. Cardiothoracic Surgery Assocs.*, 139 F.3d 532, 536 (5th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"[W]hen a district court denies a motion for summary judgment on the basis that there exist genuine issues of material fact, the district court is actually making two separate conclusions: 'First, the court has concluded that the issues of fact in question are genuine, *i.e.*, the evidence is sufficient to permit a reasonable factfinder to return a verdict for the nonmoving party. Second, the court has concluded that the issues of fact are material, *i.e.*, resolution of the issues might affect the outcome of the suit under governing law.'" *Lemoine v. New Horizons Ranch & Ctr., Inc.*, 174 F.3d 629, 633 (5th Cir. 1999) (quoting *Colston v. Barnhart*, 146 F.3d 282, 284 (5th Cir. 1998)); *Conoco, Inc. v. Medic Systems, Inc.*, 259 F.3d 369, 371 (5th Cir. 2001).

In deciding a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Credibility determinations are not part of the summary judgment analysis. *Id.* at 247-49. "Rule

56 'mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little*, 37 F.3d at 1075 (quoting *Celotex*, 477 U.S. at 322).

## III.    Analysis

A claimed invention is unpatentable if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103. Because of the presumption of validity, 35 U.S.C. § 282 (1994), a defendant must show invalidity by facts supported by clear and convincing evidence. *Dana Corp. v. Am. Axle & Mfg.*, 279 F.3d 1372, 1375 (Fed. Cir. 2002).

Whether an invention is obvious is a legal conclusion based on underlying factual inquiries, including: (1) the scope and content of the prior art; (2) the level of ordinary skill in the prior art; (3) the differences between the claimed invention and the prior art; and (4) objective indicia of non-obviousness. *See Dennison Mfg. v. Panduit Corp.,* 475 U.S. 809, 810-11 (1986); *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *Beckson Marine, Inc. v. NFM, Inc.*, – F.3d –,

2002 WL 1075097, *5 (Fed. Cir. May 30, 2002). "A district court properly may grant summary judgment on obviousness only when the underlying factual inquiries present no lingering genuine issues." *Beckson Marine*, 2002 WL 1075097 at *2.

A finding of obviousness "does not require the prior art to reach expressly each limitation exactly. Rather, obviousness may render a claimed invention invalid where the record contains a suggestion or motivation to modify the prior art teaching to obtain the claimed invention." *Id.* at *7 (citing *B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.,* 72 F.3d 1577, 1582 (Fed.Cir.1996)); *see Hartness Int'l, Inc. v. Simplimatic Eng'g Co.,* 819 F.2d 1100, 1108 (Fed.Cir.1987)("[T]he inquiry is not whether each element existed in the prior art, but whether the prior art made obvious the invention as a whole. . . .").

The Federal Circuit has acknowledged that "'virtually all [inventions] are combinations of old elements.'" *In re Rouffet*, 149 F.3d 1350, 1357 (Fed.Cir.1998)(quoting *Environmental Designs, Ltd. v. Union Oil Co.,* 713 F.2d 693, 698 (Fed. Cir.1983)).

> Therefore an examiner may often find every element of a claimed invention in the prior art. If identification of each claimed element in the prior art were sufficient to negate patentability, very few patents would ever issue. Furthermore, rejecting patents solely by finding prior art corollaries for the claimed elements would permit an examiner to use the claimed invention itself as a blueprint

for piecing together elements in the prior art to defeat the patentability of the claimed invention. Such an approach would be "an illogical and inappropriate process by which to determine patentability."

To prevent the use of hindsight based on the invention to defeat patentability of the invention, this court requires the [challenger] to show a motivation to combine the references that create the case of obviousness. In other words, the [challenger] must show reasons that the skilled artisan, confronted with the same problems as the inventor and with no knowledge of the claimed invention, would select the elements from the cited prior art references for combination in the manner claimed.

*In re Rouffet*, 149 F.3d 1350, 1357 (Fed.Cir.1998)(quoting *Sensonics, Inc. v. Aerosonic Corp.,* 81 F.3d 1566, 1570 (Fed.Cir.1996)).

"'This suggestion or motivation need not be expressly stated,' *B.F. Goodrich,* 72 F.3d at 1582, but may be shown by reference to the prior art itself, to the nature of the problem solved by the claimed invention, or to the knowledge of one of ordinary skill in the art." *Beckson Marine,* 2002 WL 1075097 at *7 (citing *In re Rouffet,* 149 F.3d at 1357). "This showing must be clear and particular, and broad conclusory statements about the teaching of multiple references, standing alone, are not 'evidence.'" *Brown & Williamson Tobacco Corp. v. Phillip Morris, Inc.,* 229 F.3d 1120, 1125 (Fed. Cir. 2000).

Intergraph asserts that "the use of interrupt vector tables and driver identification, relocation and mapping were all standard features of common operating systems such as DOS, UNIX and others. As many CAD systems were designed to operate with such systems, the motivation to add the SuperPaint innovation to CAD systems included, of necessity, the motivation to do so with CAD systems using these common operating systems." (Docket Entry No. 69, p. 10). To support its position, Intergraph relies on Dr. Walter Rudd's declaration stating that interrupt vector tables were a known part of many operating systems during the relevant period. Rudd states that "[o]ne of ordinary skill in the art would be familiar with the concepts and techniques involved in using interrupt vector tables and other means for redirecting program flow." (Docket Entry No. 72, ¶ 11). Rudd cites to texts, attached to his declaration, discussing interrupt vector tables as early as 1976.[2] (*Id.*, Ex. B). Rudd asserts that "typical undergraduate curricula in computer science" teaches a person "when and how to apply the concepts of interrupt vectors and the redirection of program execution sequences." (Docket Entry No. 72, ¶ 17). Rudd explains how this relates to the conclusion of obviousness:

---

[2]    Only two of the texts that Rudd cites were published before or during the relevant period. The remaining texts were published in the 1990s; they do not show how the concepts were understood during the relevant period.

In the case in point, it is necessary to insert a 'link' program between a CAD program that outputs commands to draw vector-based objects on a display device and the display device driver. All graphics commands are passed through the link program. Those commands that operate on the raster database are executed by the link program. The commands that involve displaying vector-based objects are passed through to the device driver.

. . .

One with ordinary skill in the art would recognize that in order to execute the graphics commands that apply to the raster database without altering the display driver, one must intercept the commands as they come from the CAD program, as described in the patent. The practitioner would know that to do that, the system must replace the interrupt vector table entry that originally points to the display device driver so that it points to the link program instead.

. . .

One with ordinary skill in the art would recognize and apply this technique, as described in claims 12, 35, and 36 of the patent and in the specification, to redirecting program control through the link program. Similarly, the practitioner would recognize and apply this technique, as described in claim 42 of the patent and specification, to redirecting program control through the edit program.

. . .

In summary, one with ordinary skill in the art would see the need to implement software like Superpaint on systems that include interrupt vector tables. Such a practitioner would find it natural to combine the ideas in Superpaint and similar programs with the idea of using interrupt vectors to intercept commands from the CAD system and to act on them accordingly. Furthermore, the practitioner would have the background and experience needed to perform the task of combining these concepts.

(*Id.* at ¶¶ 19-21).

Intergraph points out that Wylie McDonald, a co-inventor of the '393 patent, also described the concepts of interrupt vector tables, driver identification, relocation, and mapping as "standard."  McDonald testified that "the use of vector tables, the use of all these things, is very common in the DOS 3.0, 3 whatever versions.  And there's nothing unique or special about stealing interrupts.  That was done all the time for different functions and services." (Docket Entry No. 71, Ex. B, p. 108).

Intergraph asserts that the wide recognition and availability of interrupt vector tables, driver identification, relocation, and mapping was accompanied by a strong motivation to combine them, in order "to implement the SuperPaint features on a wide-variety of CAD systems, including DOS (Intel), UNIX." (Docket Entry No. 69, p. 7).  Intergraph points to co-inventor Bennett's testimony that there was considerable customer interest in software that could "vectorize" engineering, architectural, and other drawings. (Docket Entry No. 71, Ex. Ex. A, p. 40).  During the relevant period, there were millions of design drawings that had been created by hand, in "raster" format.  Intergraph asserts that it was "highly desirable" to be able to scan these documents and then "vectorize" them using the SuperPaint functionality, because "a CAD program which could readily accomplish this task

could save architects and engineers countless hours of work." (Docket Entry No. 69, p. 7). Intergraph asserts that "[t]he use of the 'interrupt vector table' and 'driver identification, relocation and remapping' functions are inherent, and fundamental to [DOS and UNIX] operating systems. Thus, the suggestion or motivation to adapt the innovation to CAD systems would, by necessary implication, include the motivation to combine it with these standard features." (Docket Entry No. 69, p. 8). Intergraph asserts that in 1987, there was a particularly strong motivation to adapt the SuperPaint to CAD systems that operated on DOS operating systems, because ninety percent of all personal computers, and a substantial percentage of network computers, had the DOS operating system. (*Id.*). In his declaration, Rudd describes the motivation to adapt the SuperPaint software to run on other operating systems, including DOS and UNIX. "For example, one might have wished to construct a competitor for AutoCAD using the ideas in SuperPaint, since AutoCAD was the most popular CAD system in the 1980s." (Docket Entry No. 72, ¶ 10).

American Imaging does not dispute that interrupt vector tables, driver identification, relocation, and mapping were widely known in the relevant period or that they were standard features of programs designed for many operating systems, such as DOS and UNIX. However, American Imaging asserts that it would not have been obvious to a person of ordinary skill in the art to achieve the claimed function

of simultaneously viewing a CAD vector image and viewing and editing a raster

image through an auxiliary program, rather than through modifying the CAD program

itself.  American Imaging asserts that:

> Intergraph has utterly failed to show a suggestion to
> actually use these known programming 'tools' to
> implement a raster-based accessory program 'on top' of a
> standard CAD package (such as the AutoCAD program) as
> the specific technique to provide this added functionality.
> SuperPaint does not suggest this dual program
> functionality; SuperPaint at best suggests to implement this
> raster functionality *within a CAD program itself*.  Neither
> does AutoCAD suggest this dual program functionality.
>
> In contrast to a single program, American Imaging instead
> developed LunaLink and LunaEdit, accessory programs
> that operated with an existing and unmodified version of
> AutoCAD to provide this unique combination.  This is the
> claimed combination that is nowhere suggested by the art.

(Docket Entry No. 77, pp. 1-2)(emphasis in original).

American Imaging asserts that the claimed technology is not simply

"remapping" but rather the use of remapping to combine an accessory program with

an existing CAD package to achieve the claimed functionality.  (*Id.* at 4).  For

example, the accessory programs described in claims 12, 35, 36, and 42 provide

raster/vector functionality using an unmodified AutoCAD, that previously displayed

only vector images. (Docket Entry No. 78, Ex. C, p. 20; Ex. D, pp. 65, 70).  The

"link" program interposed itself between the CAD package, such as AutoCAD, and

the operating system's driver routines, using interrupt redirection. The link program placed a pointer to itself in the interrupt table so that when the AutoCAD "called" the operating system's display driver, the link program would intercept the call and then simultaneously overlay its raster image with the AutoCAD's vector image, in one display window. (Docket Entry No. 78, Ex. D, pp. 104-05). The link program added the raster/vector simultaneous display feature without requiring any modification to the AutoCAD package itself.

Claims 12, 35, and 36 expressly refer to "remapping a link program means to said display driver interrupt address." (Docket Entry No. 78, Ex. A). These claims do not simply state that remapping is used or that an interrupt vector table is used. Rather, these claims state that the object of such redirection is a link program. Claim 42 similarly describes "remapping the edit program means to said driver address." (*Id.*). American Imaging asserts that while interrupt and driver redirection were known, "the use of such remapping to provide a link program with the CAD program to simultaneously display both raster and vector images on the same screen is nowhere suggested by the prior art. To the contrary, the art suggested otherwise." (Docket Entry No. 77, p. 7).

In support of its position, American Imaging has submitted a declaration from Gordon Peterson, an expert on computer software. (Docket Entry No. 78, Ex.

B). Peterson states that "[t]o the extent that SuperPaint implemented both raster and vector images, it did so in one package – to the best of my knowledge it did not include any system level display driver or interrupt remapping to provide two independent programs operating together using remapping." (*Id.* at ¶ 11). The developer of SuperPaint, William Snider, testified that SuperPaint was not designed to provide this dual program function. (Docket Entry No. 78, Ex. F, p. 30). American Imaging asserts that to the extent that SuperPaint suggested incorporating raster and vector images, it taught to do so in a single program, not through an accessory program and an unmodified CAD. In other words, SuperPaint suggested modifying the CAD program itself to achieve the dual function. Intergraph has not submitted or identified evidence showing that SuperPaint taught or suggested that a person skilled in the art could use an accessory program, such as the "link" or "edit" programs described in the remaining claims, to achieve the claimed dual functionality.

American Imaging has submitted evidence supporting its position that when the '393 patent issued, the prior art did not teach or suggest achieving the claimed functionality by using an auxiliary program with an unmodified CAD package. In his declaration, Peterson stated that the AutoCAD was an existing and well-known CAD package that allowed the user to manipulate vector images.

However, AutoCAD did not provide a way to view raster images along with the vector images. Nor did AutoCAD have an accessory program to provide this combination function, other than American Imaging's LunaLink package. (Docket Entry No. 78, Ex. B, ¶ 12). McDonald's testimony confirms this statement. (*Id.*, Ex. D, p. 79). Intergraph has not submitted or identified evidence showing that the AutoCAD taught or suggested the use of an accessory program, such as the "link" and "edit" programs, with an unmodified CAD program to provide the claimed dual functionality.

Peterson also described Terminate and Stay Resident programs ("TSRs") that were used with an older version of the DOS operating system and existed when the '393 patent issued. These programs used driver redirection/interrupt and remapping. However, these programs avoided interaction with the underlying program's screen display. (Docket Entry No. 78, Ex. B, ¶¶ 13-15). Instead, TSRs stored and preserved the underlying program's window while the user performed functions in a separate window, then restored the underlying program window. TSRs did not alter the screen of the underlying program. (*Id.*). Peterson stated that none of the prior art, including the SuperPaint, the AutoCAD, or the TSRs, suggested implementing an existing, unmodified CAD package with a separate "link" or "edit" program that interacted through the device driver to display raster and vector data

simultaneously while permitting the user to operate in a single window. (*Id.* at ¶ 17).

Peterson also stated that nothing in the portions of McDonald's testimony that Intergraph cited was inconsistent with his opinion. McDonald stated that interrupt vector tables were commonly used in DOS and "there's nothing unique or special about stealing interrupts. That was done all the time for different functions and different services." Peterson explained: "That simply shows that a programmer could use these tool once someone had come up with the idea of doing so in the specific implementation called for in the claims – that is, combining an edit or link program through redirection with an underlying CAD package so that they could both operate on the same screen. The first suggestion I have seen to do this was in the '393 patent." (*Id.* at ¶ 22).

To show that the remaining claims were obvious and therefore invalid, Intergraph must show that the prior art suggested to or taught a person of ordinary skill in the art not only the elements described in the claim, but also to combine those elements in the claimed manner. *In re Rouffet*, 149 F.3d 1350, 1357 (Fed.Cir.1998); *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1570 (Fed.Cir.1996). The evidence Intergraph has submitted shows that the interrupt tools described in claims 12, 35, 36, and 42 were well-known in the art during the relevant period. However, Intergraph has not presented clear and convincing evidence that the prior art would have taught

or suggested to a person of ordinary skill in the art to combine those tools by implementing them through an accessory program, permitting the user simultaneously to display and modify a raster image while viewing a vector image with an unmodified CAD package.   American Imaging has presented evidence showing disputed issues of fact material to determining whether the prior art taught or suggested using the claimed tools with a separate accessory program, as claimed in the '393 patent, rather than modifying the CAD package itself, to achieve the raster/vector dual functionality.  This court finds that these are disputed issues of fact material to determining whether the remaining claims are obvious, that preclude summary judgment.

## IV.    Conclusion and Order

Intergraph's motion for summary judgment is DENIED.  Counsel will appear in Courtroom 11-B on **August 30, 2002 at 2:00 p.m.**, for a status conference that will establish a scheduling and docket control order for the issues remaining in this case.

SIGNED on June 23, 2002, at Houston, Texas.

Lee H. Rosenthal
United States District Judge